# State of New York Court of Appeals

MEMORANDUM

This memorandum is uncorrected and subject to revision before publication in the New York Reports.

No. 56
The People &c.,
        Respondent,
    v.
Eric Ibarguen,
        Appellant.

Benjamin Welikson, for appellant.
John M. Castellano, for respondent.
New York Civil Liberties Union, amicus curiae.

MEMORANDUM.:

The order of the Appellate Division should be affirmed.

CPL 710.60 (1) requires that a motion for suppression of physical evidence must

state the ground or grounds of the motion and must contain sworn allegations of fact.  CPL

710.60 (3) permits summary denial of a suppression motion where the motion papers do not provide adequate sworn allegations of fact (*see People v Mendoza*, 82 NY2d 415, 422 [1993]). The suppression court did not abuse its discretion in denying, without an evidentiary hearing, that branch of defendant's motion which was to suppress the physical evidence recovered upon the search of the apartment pursuant to a search warrant that had been executed after his arrest, because the allegations in the motion papers were insufficient to warrant a hearing.

Contrary to the dissent's assertion, *LaFontaine* and its progeny do not forbid an affirmance here (*People v LaFontaine*, 92 NY2d 470 [1998]; *People v Nicholson*, 26 NY3d 813 [2016]). In denying defendant's motion, the suppression court stated that "defendant has failed to sufficiently allege standing to challenge the search of the subject premises," which is the gravamen of our holding today.[1] Defendant's remaining arguments addressed by the dissent, including the assertion that dinner guests have an expectation of privacy in the home of their hosts, are academic.

---

[1] We note that the suppression court granted that branch of defendant's motion for a *Dunaway* hearing (*Dunaway v New York*, 442 US 200 [1979]) to determine whether law enforcement had probable cause to effect his arrest and the admissibility of his statements to police, after concluding that defendant "failed to . . . identify physical evidence recovered from his person."

WILSON, J. (dissenting):

> Ladies, a general welcome from his Grace
> Salutes you all. This night he dedicates
> To fair content and you. None here, he hopes,
> In all this noble bevy has brought with her
> One care abroad. He would have all as merry
> As, first, good company, good wine, good welcome
> Can make good people.

(William Shakespeare, *Henry VIII*, Act I, sc. 4).

Though our homes are not so grand as Hampton Court Palace, they are our sanctuaries. Most of us can readily imagine inviting friends to dine in our home, where we sit, in private, to enjoy their company and confidences. It is much harder to imagine the police bursting in without a warrant in the midst of your dinner, ransacking your home for evidence that might incriminate one of your guests, removing you and your guests from your home, securing it overnight, and, based on what they observed, obtaining a search warrant, which they subsequently use to seize evidence from your home. Even if the police have good reason to suspect one of your dinner guests – but not you – of criminal behavior, is this police behavior our society – our Constitution – should condone?  More to the point in this appeal, if your dinner guest testifies under oath that the above happened, should that guest be entitled to an evidentiary hearing before a court decides that, although *you* would have been able to challenge the lawfulness of the search and seizure, your guest has no right to a hearing because it wasn't your guest's home?

Mr. Ibarguen swore, under oath, that this happened to him, with his additional testimony that he was innocent of all wrongdoing and the police had the wrong man. Certain inconsistent statements by the police tend to support his claim of innocence, though others contradict it. Instead of holding a hearing to determine what expectation of privacy he had when the police burst in and whether the evidence must be suppressed, the suppression court denied his motion on the ground that he had no right of privacy in any part of his friend's apartment while he was an invited dinner guest or, alternatively, because the police later acquired a warrant based on evidence they observed upon their warrantless

entry. Because the Fourth Amendment protects individuals against such intrusions and our statutes entitle all of us to a hearing under like circumstances, I dissent.

I

On March 4, 2015, around 7:00 P.M, an undercover detective and Detective Joseph Fernandez conducted a "buy and bust" operation to purchase heroin from a person self-identified as "Spanky." Spanky and the undercover detective spoke by phone to set up the deal and a place to meet a few minutes later. When the undercover detective arrived at the designated location, he observed Spanky talking on a cellular phone. Meanwhile, Detective Fernandez sat in a nearby unmarked car while he observed Spanky and the undercover detective talk. His visibility was limited – it was dark, raining and Detective Fernandez could not see Spanky's face. All he could say was that Spanky was wearing an oversized black jacket. The undercover detective testified that during the conversation Spanky sold him four small wax paper bags ("glassines") of heroin for two traceable, or pre-recorded, $20 bills. Detective Fernandez, seeing the undercover detective's signal that the buy was complete, exited his car with his badge visible to arrest Spanky, who ran.

Detective Fernandez chased the fleeing person, at a distance of 15 to 20 feet, to a short staircase leading to the basement of an apartment building, when the person slipped and looked back, allowing Detective Fernandez to see his face briefly in the basement lighting. The person entered the building and Detective Fernandez followed through two doors, the latter of which led into the apartment where defendant Eric Ibarguen was arrested. On the present record, we cannot tell in what part of the apartment the police

apprehended Mr. Ibarguen. In his sworn grand jury testimony, Detective Fernandez testified to apprehending the man he was chasing just inside the door to the apartment. At trial, he said he chased the man into the living room of the apartment, where he placed him under arrest. Detective Fernandez testified that he identified Mr. Ibarguen as Spanky not by the jacket he was wearing (he was not), nor by finding the pre-recorded bills on his person (they were not), nor even from finding on Mr. Ibarguen's person the cell phone Spanky used minutes earlier (it was not), but rather from having seen his face in the stairwell and by his cold body temperature and racing heart.

Upon arresting Mr. Ibarguen and the two other occupants, the police "froze" the apartment—preventing the entry of any person into the apartment overnight—and sought a warrant to return to search the home. To justify the warrant's issuance, Detective Fernandez relied not just on what transpired before he entered the apartment (*i.e.* the buy and bust operation and his pursuit of Spanky), but also his observations once inside the apartment, including his seeing several glassines of a substance he believed to be heroin. The court issued the warrant the next morning and the police searched the apartment, where they found one $20 pre-recorded bill inside the bathroom on the floor and an XXL-sized black jacket next to the bathroom. They did not find the cell phone Spanky had used to communicate with the police or the other pre-recorded bill. No fingerprint or DNA tests were ordered for the glassines recovered in the buy-and-bust to connect them to Mr. Ibarguen. The only other evidence linking Mr. Ibarguen to the buy-and-bust the night of

his arrest was a show-up with the undercover detective, who identified Mr. Ibarguen as Spanky, and Detective Fernandez's testimony regarding the chase.

Mr. Ibarguen testified to the events differently. Mr. Ibarguen, an operations manager of nine years, had been invited by friends down the street from his home to dine with them that evening. A little after 7:00 PM, police officers in plain clothes broke down the two doors leading to the basement apartment in a "commotion". The officers asked Mr. Ibarguen—a Latino man—and his two hosts "where is he?" and explained that they were looking for "a short, fat [B]lack man wearing a black hoody". After the police first asked Mr. Ibarguen and his two hosts to leave the apartment and performed frisk searches on each of them, they asked the group to return inside. The officers then arrested Mr. Ibarguen— throwing him to the bed, pinning him down with a knee on the small of his back, and hitting him in the face. Mr. Ibarguen concedes that the evening's events caused his heart to race.[1]

The People charged Mr. Ibarguen with the criminal sale of a controlled substance in the third degree. Before trial, Mr. Ibarguen moved to suppress the evidence obtained in the search of the apartment, averring that he was "present at the subject location" when police entered without the consent of the apartment owners. He denied all allegations,

---

[1] At the Grand Jury proceedings, the prosecutor asked the following:

> Ms. Jahn: And isn't it a fact that your heart was racing at that time?
> Mr. Ibarguen: My heart was racing, absolutely. If you have people crashing somewhere you are having dinner, I am sure your heart would be racing too, ma'am.

including having participated in the sale of heroin to the undercover officer. He further swore that he was "a lawful invitee" in the apartment and that he received his mail at his friends' apartment, granting him "[s]tanding to challenge the search of his person as well as the location therein". In his motion, he requested a hearing "to determine the constitutionality of the search and seizure" in the apartment. The People opposed the motion, arguing that Mr. Ibarguen's assertions failed to "establish standing" because "[s]imply receiving mail at a location or eating dinner at a friend's residence does not confer upon the defendant a legitimate expectation of privacy". Because the "allegations did not establish a privacy interest in the area searched," the People argued Mr. Ibarguen lacked standing and had failed to allege sufficient facts for a hearing. The People affixed Mr. Ibarguen's grand jury testimony to their papers, in which he described eating dinner at the searched apartment and the intrusion of the police. The trial court summarily denied the motion for the *Mapp* hearing because (1) "probable cause was found by the court when the warrant was issued and (2) Mr. Ibarguen "failed to sufficiently allege standing to challenge the search of the subject premises."

Mr. Ibarguen was convicted after a jury trial in the Supreme Court of Queens County in May of 2017. He appealed. The Second Department affirmed his conviction, holding that he "failed to establish a reasonable expectation of privacy in the apartment at which he was merely a casual visitor, and thus, he lacked standing to challenge the warrantless entry and subsequent search of the premises."

II

The Fourth Amendment protects against unreasonable searches and seizures (U.S. Const. amend. IV). Searches of homes carried out without a warrant are presumptively unreasonable, unless they fall into one of the specific exceptions to the general warrant requirement (*Groh v Ramirez*, 540 US 551, 559 [2004] [quoting *Payton v New York*, 455 US 573, 586 (1980)]). Where the police have carried out a search of a home without a warrant, the People carry the burden of proving their actions met a particular exception (*People v Hodge*, 44 N.Y.2d 553, 558 [1978]). Here, the police entry into the apartment plainly violated the constitutional rights of the people who lived in the apartment. The police did not possess a warrant when they entered the home and, since the intrusion, the People have never argued any exigency to justify the entry. Still, the question in this case is not the broad constitutionality of the entry, but rather whose rights, in addition to the apartment's residents', it may have violated.

Although the Constitution is silent as to the enforcement of the Fourth Amendment, the "principal" remedy to deter Fourth Amendment violations is the exclusion of unlawfully procured evidence from use at trial (*James v Illinois,* 493 US 307, 311 [1990]; *see also* Utah *v Strieff*, 136 S. Ct. 2056, 2061 [2016] [Sotomayor, J., dissenting] [*citing Mapp v Ohio*, 367 US 643, 655 [1961]; *Weeks v United States*, 23 US 383 [1914]). In *Mapp*, the Supreme Court explained that to prohibit unreasonable searches and seizures but allow the admission of evidence procured through such actions would be to "grant the right but in reality to withhold its privilege and enjoyment" (*Mapp*, 367 US at 656). For that reason, courts do not allow the government to use against you evidence obtained in

violation of your constitutional rights. However, to challenge evidence as unconstitutionally procured, a criminal defendant must show that the defendant's own constitutional rights were violated (*Rawlings v Kentucky*, 448 US 98, 106 [1980]); *Rakas v Illinois*, 438 US 128, 148 [1978]). Thus, to assert the protection of the Fourth Amendment, an individual must show a legitimate privacy interest in the place searched (*Rakas v Illinois*, 439 US 128, 148 [1978]). A privacy interest is legitimate when it is one "society is prepared to recognize as 'reasonable'" (*Katz v US*, 389 US 347, 361 [1967] [Harlan, J., concurring]; *Minnesota v Olson*, 495 US 91, 96 [1990]). Without such a privacy expectation, no search, and thus no constitutional violation, has occurred. Although it is undisputed that a person has a right to be free of warrantless searches and to suppress the evidence found in such a search in one's own home, Mr. Ibarguen's claim arises in the murky arena of house guests, or those against whom the state seeks to introduce evidence found in private places where a person is lawfully present but does not reside.

The privacy interest of social guests is an unsettled and evolving area of Fourth Amendment law. In earlier cases, the Supreme Court held any person "legitimately on premises where a search occurs may challenge its legality" (*US v Jones*, 362 US 257, 267 [1967]); *see also People v Wesley*, 73 NY2d 351, 355 [1989]; However, in subsequent decisions the Supreme Court "substantially reevaluated the nature of the interest that would give rise to Fourth Amendment standing" (*Wesley,* 73 NY2d at 356). Specifically, in *Rakas v Illinois*, the Supreme Court repudiated the approach in *Jones* – no longer would someone "legitimately on the premises" automatically be recognized as having a privacy interest in

another's premises (438 US 128, 142 [1978] ["we believe that the phrase 'legitimately on premises' coined in *Jones* creates too broad a gauge for measurement of Fourth Amendment rights"]). Rejecting the expanded view of standing at the heart of *Jones*, *Rakas* also clarified that a person's ability to challenge evidence procured by unlawful searches and seizures should not be considered to be one of "standing" (*id.* at 138). Rather, the Court explained that the question "is more properly subsumed under substantive Fourth Amendment doctrine" (*id.* at 139). Thus, the only relevant inquiry is whether a person held a legitimate privacy interest. If so, and that interest was violated, evidence obtained through the violation of that privacy interest must be suppressed.

The Supreme Court's subsequent cases touching on the privacy interest of house guests have left many questions unanswered. In *Olson*, the Supreme Court held that overnight guests have a legitimate privacy interest in the residence where they sleep and so are protected against unreasonable searches and seizures in that home (*Minnesota v Olson*, 495 US 91, 98 [1990]). In *Carter*, nearly a decade later, the Court divided over the scope of the privacy interests of house guests who do not stay overnight (525 US 83 [1998]). The *Carter* majority held that two men who were in another's apartment for the sole purposes of completing a commercial drug operation did not have a privacy interest in the premises (*id.* at 90). Justice Kennedy concurred to emphasize the consistency of that holding with his view that "all social guests have a legitimate expectation of privacy, and hence protection against unreasonable searches, in their host's home" while four justices wrote separately to disagree on different grounds, arguing that even the commercial guests

had a legitimate expectation of privacy in the premises (*id.* at 103, 107). The majority opinion itself acknowledged the inchoate nature of privacy rights as one moved across the spectrum from overnight guest to a momentary invitee: "If we regard the overnight guest in…*Olson* as typifying those who may claim the protection of the Fourth Amendment in the home of another, and one merely 'legitimately on the premises' as typifying those who may not do so, the present case is obviously somewhere in between" (*id.* at 90).

The remaining gaps on the spectrum have not been clarified in the years after *Carter,* although since then numerous states have confronted the question of social guest privacy (*see e.g. State v Talkington*, 345 P3d 25, 276-77 (Kan. 2015); *State v Missouri*, 361 SC 107, 114 (SC 2004); *Morton v United States*, 734 A2d 178, 182 (DC 1999) ["social guests of the host generally have a legitimate expectation of privacy"]). In New York, few cases addressing the issue since *Olson* and *Carter* have reached our Court (*People v Jose*, 94 NY2d 844, 845 [1999]; *People v Ortiz*, 633 NY2d 840 [1994]). This appeal thus raises two important questions regarding the privacy rights of social guests and the implications of those rights for hosts and our communities more broadly. The first is: what must a defendant seeking to suppress evidence found in the search of another's home allege to obtain a suppression hearing? The second more directly addresses the contours of social guest privacy: after *Carter*, what protections does the Fourth Amendment provide against police intrusion for guests invited into another's home? The majority avoids both questions. I would answer them.

III

A

Mr. Ibarguen was entitled to a suppression hearing. Section 710.60 of the Criminal Procedure Law governs entitlement to a suppression hearing before trial in New York. It requires motions to be "in writing, state the legal ground of the motion and 'contain sworn allegations of fact,' made by the defendant or 'another person'" (*People v Mendoza*, 82 NY2d 415, 422; CPL § 710.60). Then, "[b]ased on these papers, the court must decide whether to summarily grant or deny the motion[] or conduct a hearing" (*id.*). A court must summarily grant the motion when the defendant's papers satisfy the statutory requirements and the People do not dispute the defendant's alleged facts (CPL 710.60 [2]). A court may summarily deny the motion for one of two reasons only: (1) the defendant "does not allege a proper legal basis for suppression" or (2) the "sworn allegations of fact do not as a matter of law support the ground alleged" (*id.*; CPL 710.60 [3] [b]).

Although the statute's plain language mandates a hearing whenever the statutory requirements are met and there are no grounds to summarily deny or grant a motion, our Court has observed that "[h]earings are not automatic or generally available for the asking by boilerplate allegations" (*Mendoza*, 82 NY2d at 422). Rather, in a restrictive interpretation of CPL 710.60 (3) (b) (grounds for summary denial), we require defendants' sworn allegations to be sufficient, determined "with reference to the face of the pleadings, the context of the motion and defendant's access to information" (*id.*). For motions to suppress tangible evidence, defendants are "entitled to rely on the People's proof" (*People v Burton,* 6 NY3d 584, 588 [2006]), which means "necessary allegations of fact" can be

found in police testimony and motion papers (*id.*; *see also People v Gonzalez*, 68 NY2d 950, 950 [1986] ["evidence elicited during the People's direct case may be cited in support of a defendant's standing claim"]). However, compared to those seeking a hearing to suppress evidence obtained through an unlawful arrest, the burden needed for a hearing to suppress evidence obtained through an alleged unlawful search is higher under *Mendoza*'s third criterion—the defendant's access to information: "[I]t is after all the defendant alone who actually knows [the defendant's] connection with the searched area" (*Mendoza*, 82 NY2d at 429 [quoting *Wesley*, 73 NY2d at 358-359]).

Indeed, motions for a hearing to suppress evidence procured from unlawful searches meet an additional burden: on the face of the pleadings, they must show the search violated the defendant's rights, or (in a standard the Supreme Court has expressly rejected, *see infra*) that the defendant has "standing" to challenge the search (*Wesley*, 73 NY2d at 358 ["CPL 710.60…allocates to the defendant seeking suppression of evidence the initial burden of showing sufficient grounds for the motion based on sworn allegations of fact; such grounds necessarily include a showing of standing – that is, a legitimate expectation of privacy in the searched premises"]). As recently as 2006 we have held: "[t]here is no legal basis for suppression and, hence, no need for a hearing, unless the accused alleges facts that, if true, demonstrate standing to challenge the search or seizure" (*Burton*, 6 NY3d at 587).

Those cases, inasmuch as they focus on "standing" and not the privacy interests of criminal defendants seeking to suppress evidence, misapply the law. In *Carter*, the Supreme Court offered a sharp rebuke of the Minnesota Supreme Court's continued

reliance on the "rubric of [Fourth Amendment] 'standing doctrine, an analysis that this Court expressly rejected 20 years ago in *Rakas*" (*Carter*, 525 US 83 [1998]). The Court explained "[c]entral to [its] analysis was the idea that in determining whether a defendant is able to show the violation of [the defendant's] (and not someone else's) Fourth Amendment rights, the 'definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing'" (*id.* at 88 [quoting *Rakas*, 439 US at 140)]). Thus, "standing" is simply the wrong framework to apply in any Fourth Amendment suppression case, no less to read into a statute silent as to the issue.

Fortunately, our caselaw has at least attempted to distinguish the burden required to secure a hearing from what is needed to prove a legitimate privacy interest once a hearing is granted. For example, in *People v Jose*, the suppression court summarily denied a hearing after the defendant, in his motion papers, alleged that the police entered an apartment, seized items, and retrieved a key to the apartment in a search of the defendant's person (239 AD2d 172, 173 [1997]). The Appellate Division remitted for a *Mapp* hearing, finding the summary denial to be an abuse of discretion as the possession of a key to the apartment was sufficient factual assertion to warrant a hearing to further evaluate the defendant's legitimate expectation of privacy (*id.*). However, the Appellate Division disagreed with the suppression court's finding that the key alone was sufficient to show a legitimate expectation of privacy, explaining "having made sufficient factual allegations to get a hearing, defendant still had the burden at that hearing of 'establishing standing by

demonstrating a legitimate expectation of privacy'" (252 AD2d 401, 402 [1998] [quoting

*People v Wesley*, 73 NY2d 351 (1989)]; *see also Ortiz*, 83 NY2d 840 [1994] [finding no

privacy interest in the apartment even after an evidentiary hearing]; *People v Ponder*, 54

NY2d 160, 166 [1981] [finding no privacy interest in the defendant's grandmother's house

after an evidentiary hearing]). We affirmed (94 NY2d 844, 845 [1999]).

The few cases in which we have affirmed summary denials of suppression hearings

concerning warrantless searches of homes are extreme ones, in which the defendants

proffered no information demonstrating a legitimate privacy interest. In *People v Reynolds*,

for example, the defendant argued to suppress evidence found in a police search of a

greenhouse located 150 feet from the defendant's home (71 NY2d 552, 556 [1998]).

Because the defendant did not controvert the People's alleged facts (*e.g.* the location of the

greenhouse to the house) but only and without further explanation asserted that the

greenhouse was located in the house's curtilage, we affirmed (*id*. at 558). Similarly, in

*People v Gomez*, a case predating both *Olson* and *Carter*, we affirmed the summary denial

of a suppression hearing when the defendant moved for a hearing to suppress evidence

found in an apartment but did not explain his relationship to the apartment (67 NY2d 843,

844 [1986]).

B

The majority eschews this prudent approach. Unlike the defendants in *Reynolds* and

*Gomez*, who failed to proffer any facts supporting their privacy claims, Mr. Ibarguen's

motion papers allege that he was a lawful invitee whose mail was delivered to that

apartment and Mr. Ibarguen testified to having been at dinner at his friends' house "all night." Those facts support his claim that as a social guest, he held a legitimate expectation of privacy in at least some part of the searched apartment enabling him to challenge the legality of the warrantless search and suppress evidence recovered therein. Thus, unlike the defendants in *Reynolds* and *Gomez*, for whom summary denial was appropriate under CPL 470.50 (2), Mr. Ibarguen was entitled to a hearing in which to argue his privacy claim. Nonetheless, the suppression court held that he lacked "standing" to challenge the warrantless search of the apartment – the Appellate Division agreed. The majority affirms. Several problems riddle that holding.

First, the majority is affirming on a ground not adopted by the courts below. Instead of focusing on Mr. Ibarguen's threshold showing entitling him to a hearing, both the Appellate Division's rationale and the suppression court's second rationale go straight to the merits of whether—as a matter of law—a dinner guest can have an expectation of privacy. Neither lower court said that Mr. Ibarguen had failed to adduce sufficient evidence to entitle him to a hearing; both, instead, jumped straight to the legal question of whether Mr. Ibarguen had "standing" to challenge anything that occurred in his friends' apartment. The suppression court did not say that Mr. Ibarguen's motion papers did "not provide adequate sworn allegations of fact" (majority op at 2) or cite *Mendoza*—the sole case on which the majority relies for its holding—or any other case setting out the standard for denial of a hearing on a suppression motion. Instead, the suppression court offered two different reasons for denying suppression: (1) "probable cause was found by the court when

the warrant was issued"; and (2) "defendant has failed to sufficiently allege standing to challenge the search of the subject premises or identify physical evidence recovered from his person." The Appellate Division did not attempt to defend the suppression court's first ground,[2] but instead affirmed on the ground that because Mr. Ibarguen "was merely a casual visitor . . . he lacked standing to challenge the warrantless entry and subsequent search of the premises." The Appellate Division did not cite *Mendoza*, but instead cites only *Ortiz*, which concerns the scope of the expectation of privacy as a matter of law and

---

[2] The suppression court's first ground is insupportable. Police cannot enter a home without a warrant, consent or exigency, observe evidence of law breaking, and then, based on those observations, procure a warrant to return to search the home. The Supreme Court explained in *Alderman v US*:

> "If the police make an unwarranted search of a house and seize tangible property…the homeowner may object to its use against [the homeowner]…because they were the fruits of an unauthorized search of [the homeowner's] house, which is itself expressly protected by the Fourth Amendment. Nothing seen or found on the premises may legally form the basis for an arrest or search warrant or for testimony at the homeowner's trial, since the prosecution would be using the fruits of a Fourth Amendment violation" (394 US 165, 177 [1960]).

Indeed, "[a]ny other view would tend in actual practice to emasculate the search warrant requirement of the Fourth Amendment" (*US v Griffin*, 502 F2d 959, 961 [6th Cir. 1974]).

We have upheld the validity of a warrant procured after police "secured" an apartment after a buy and bust, but only where the warrant was based "solely on information obtained by the undercover officer prior to and independent of the illegal entry" and there was "not the slightest hint that the search warrant was in any way tainted by the illegal entry or that the police had exploited the entry in an effort to obtain evidence" (*People v Arnau*, 58 NY2d 27, 33 [1982]). Here, multiple paragraphs in the warrant application describe the glassines of heroin observed inside the apartment and Detective Fernandez's training and experience identifying drugs by their appearance—certainly more than the "slightest hint" of connection between the warrant and the police entry on March 4.

has nothing to do with the sufficiency of evidence required to obtain a hearing. Both lower courts denied suppression on the ground that Mr. Ibarguen, as a social guest with these facts, had no expectation of privacy. Neither mentioned on what statutory grounds the summary denial of the suppression hearing might be proper.

Thus, despite the majority's protestations to the contrary, it is affirming Mr. Ibarguen's conviction on a different ground than that on which the lower courts denied suppression: the lower courts held that Mr. Ibarguen had no protectible privacy interest in his friends' home—here the majority holds that Mr. Ibarguen did not provide adequate sworn allegations of fact to obtain a hearing. Were the majority to reach the privacy issue on the merits, as the lower courts did, it would have to deal with the tension between *Ortiz* and *Carter*. Instead, the majority affirms on a different ground that does not implicate the scope of privacy rights: Mr. Ibarguen failed to make a threshold showing sufficient to entitle him to a hearing on his suppression motion. We are not allowed to affirm a conviction on a ground not reached below (*People v LaFontaine*, 92 NY2d 470 [1998]; CPL 470.15 [1]).

Moreover, the majority's rule enacts a dangerous obstacle for social guests to obtain a hearing in the future. Social guest privacy is different from the type of more common issues that lead to motions to suppress evidence, such as searches incident to an alleged unlawful arrest or an overbroad warrant—areas of law with rich bodies of precedent on which to draw. By contrast, as the splintered opinion in *Carter* demonstrates, the circumstances under which a social guest in a private home will have an expectation of

privacy—and over what portions of the dwelling that privacy interest may extend—are highly unsettled. Tellingly, the only two cases in which we have considered the issue after *Carter*—*Ortiz* and *Jose*—are cases in which the suppression court held an evidentiary hearing, so that the complex contours of the right to privacy could be determined on a full record. We have affirmed the summary denial of a suppression hearing in the social guest context only when the defendants proffered no facts at all to support their privacy claims (*Reynolds*, 71 NY2d 552, 556 [1998]; *Gomez*, 67 NY2d 843, 844 [1986]). When, as here, the underlying law is unsettled, the need for an evidentiary hearing is greater: the few and distant guideposts in this area cannot be clarified and supplemented without a full factual record allowing courts to make thoughtful, well-informed decisions.

In a case both riddled with factual inconsistencies[3] and in which the applicable law is so unsettled, a hearing is the bare minimum that our statute requires. Mr. Ibarguen should

---

[3] Police testimony as to Mr. Ibarguen's arrest raises numerous questions. If Detective Fernandez was 15-20 feet behind Mr. Ibarguen, but caught up to him enough to see which door Mr. Ibarguen entered in the basement of the apartment building, why wasn't Mr. Ibarguen wearing the black jacket the police observed or carrying the two $20 pre-recorded bills when he was apprehended? According to Detective Fernandez's grand jury testimony, he apprehended Mr. Ibarguen at the front door—if that is true, how could Mr. Ibarguen have had time to remove the jacket and bill and place them in and near a bathroom? Even if Detective Fernandez reached Mr. Ibarguen in the living room, he claims to have never lost eyesight of him, and yet Detective Fernandez does not report witnessing Mr. Ibarguen remove the coat or discard the bill or cell phone. Rather, Detective Fernandez denied seeing the person he was chasing discard any objects, raising yet another issue: one bill and the cell phone used to communicate with the police and that Spanky was seen holding as the buy began was never recovered. Perhaps most glaring: the police entered the apartment and asked Mr. Ibarguen for "a fat Black man" – Mr. Ibarguen is neither. Only after the police failed to locate such a person did they take Mr. Ibarguen in custody.

be granted the opportunity to obtain a judicial determination, based on a full record, of the scope of his privacy expectation in the apartment on March 4, 2015[4].

IV

A hearing might have allowed the People to demonstrate that Mr. Ibarguen lacked a protectible privacy interest for reasons not presently in the record. It might have permitted Mr. Ibarguen to strengthen his claim. Left with only Mr. Ibarguen's initial showing, I would hold that Mr. Ibarguen, as a dinner guest at his friends' apartment, had a privacy interest that the New York police violated when they entered without a warrant. The consequences of holding otherwise are frightening: the government could place cameras or bugging devices in your home, so long as the evidence was used only against your guests. It could enter your home at will, without a warrant, so long as whatever it found was used only against your guests, not your family.

A

---

[4] The majority's footnote pointing out that Mr. Ibarguen was granted a *Dunaway* hearing has no bearing on whether he was entitled to a *Mapp* hearing. That footnote does suggest two things.  First, the fact that the police found nothing on Mr. Ibarguen's person when he was searched upon arrest tends to suggest either that the Mr. Ibarguen was not "Spanky" (because he had neither Spanky's phone nor the premarked buy money) and/or that the police account as to the closeness of their pursuit of Spanky is not accurate.  Second, once the court granted a *Dunaway* hearing, the additional time needed to hold a joint *Mapp/Dunaway* hearing would have been modest, particularly given the identity of the witnesses on the two issues.

Initially, I address the People's argument that Mr. Ibarguen has failed to preserve his claim. The People contend Mr. Ibarguen failed to preserve his challenge to the inclusion of evidence recovered in the apartment because he failed to raise the issue of his privacy rights as a social guest with the specificity that CPL 470.05 (2) requires. In particular, the People take issue with Mr. Ibarguen not having more clearly articulated his legal theory of social guest standing, including by citing to the controlling Supreme Court cases *Olson* and *Carter*. Indeed, the People contend that had the suppression court understood Mr. Ibarguen to have been arguing that his own privacy rights were violated because he was a social guest, and the court agreed, the court would have been "compelled" to order a hearing to determine the facts of his status. Without a hearing, the People note, this Court is deprived of a full record. In this, the People interpret the suppression court's explicit finding that Mr. Ibarguen lacked "standing to challenge the search of the premises" as nothing more than "a one sentence denial" not considering the possibility that standing could be conferred by social-guest status. Aside from sharing the People's regret at our limited record, I find this untenable—Mr. Ibarguen argued he was a "lawful invitee" whose rights were violated when the police entered the apartment "without the consent of the [apartment] owners." The suppression court responded to that contention by specifically denying it: "defendant has failed to sufficiently allege standing to challenge the search of the subject premises." The legal theory Mr. Ibarguen argues now is the same one he raised in both courts below: his status as an invited guest at the apartment who shared a meal and received mail at the premises entitled him to a privacy expectation the Constitution recognizes. My view of the People's argument notwithstanding, the majority—by reaching

the merits of Mr. Ibarguen's claim that he was improperly denied a hearing—necessarily holds that his challenge was sufficiently preserved, otherwise it could not have affirmed on any ground other than lack of preservation.

B

Although *Olson* and *Carter* left significant space on the spectrum of social guest privacy undefined, their holdings support the conclusion that social guests invited to share dinner have some reasonable expectation of privacy. The Court in *Olson* emphasized that overnight guests have legitimate privacy expectations in their hosts' homes because of the centrality of spending the night in another's home to work, travel and family and the value society places on that time, as well as the particular vulnerability of sleep, noting that this combination of factors must elevate our privacy expectation in the homes we visit to at least the level of privacy we expect in a public phone booth (*Olson*, 495 US 91, 98-99 [1990]). In *Carter*, the Court held that short-term commercial guests are dissimilar and lack the same expectation of privacy but five Justices agreed with the principle that social guests have sufficient privacy interests in their hosts' homes to contest the illegal seizure of evidence therefrom (*Carter*, 525 US at 91). A person who attends a dinner at a friend's home for the evening—a friend who is trusted enough to receive the guest's mail at the host's home—is entitled to at least as much privacy as one would expect in a phone booth or public restroom (*Katz*, 389 US 359; *People v Mercado*, 68 NY2 847, 876 [1986]). The relationship is noncommercial and a quintessential gathering among friends in a private residence where host and guest alike expect to be able to share woes and dreams in privacy.

To the extent that a rule that dinner guests have a reasonable expectation of privacy in their hosts' homes is an extension of *Olson,* longstanding care for the privacy of the home and its ramifications for democracy would support that rule. "All great change in America begins at the dinner table" (Ronald Reagan, Farewell Address [Jan. 11, 1989] https://www.reaganfoundation.org/media/128652/farewell.pdf). Colonial outrage at the ransacking of homes by British soldiers "in an unrestrained search for evidence of criminal activity" was a driving force behind the Fourth Amendment (*Riley v California*, 573 US 373, 403 [2014]). Accordingly, the home is "ordinarily afforded the most stringent Fourth Amendment protection" (*US v Martinez-Fuerte*, 428 US 543 [1973]). Caselaw shows repeated efforts to safeguard the privacy of the home. Beyond the warrant requirement for physical entry, police are also prohibited from using thermal imaging technology to monitor the activities of those inside (*Kyllo v US*, 533 US 27, 35 [2001]). Privacy interests in the home are so strong that not just the home's internal structure is protected, but the surrounding adjacent areas, such as a front porch, as well (*Florida v Jardines*, 133 SCt 1409, 1415 [2013]). In contrast to a public arrest, for which no warrant is needed, a warrant is required to arrest someone at home (*Payton v New York*, 445 US 573, 603 [1980], *revg People v Payton*, 45 NY2d 300 [1978]). Even where police are lawfully permitted to enter the home to perform an arrest, the area they may then search is sharply limited (*Chimel v California*, 395 US 752, 765 [1969]). Perhaps most germane to this case: to arrest a person in a third party's home, the police must first obtain a search warrant for that residence (*Steagald v United States*, 451 US 204, 222 [1981]).

The stakes of privacy in a home are important not just to the personal lives of individuals, but to our democracy. The Framers were concerned with the potential for abuse that granting broad discretion to law enforcement engendered (*Steagald*, 451 US at 220). Recent Supreme Court decisions have shown heightened concern over the threat of government surveillance in a new age of pervasive technology (*Carpenter v United States*, 138 S Ct 2206 [2018]; *Riley*, 573 US 373 [2014]; *Kyllo*, 533 US at 35). Even with safeguards, surveillance has meant a diminishment of spaces protected from the chilling effects of government snooping. The home remains as a site of important conversations, activities and relationships.

However, the continued vitality of the home as a gathering place depends on the privacy our law affords those inside. From the Suffolk Resolves to the underground railroad to grassroots political organizing in this century, home gatherings have always been a site of political debate and activism (*See* Eric Foner, Gateway to Freedom 66 [2015]). Particularly for dissenting groups for whom the public sphere is hostile, the home offers a place of retreat and discretion, without which many groups may choose not to meet. Indeed, the right to associate is closely linked the ability to keep one's associations private (*NAACP v Alabama*, 375 US 449, 462 [1958]). The Supreme Court recognized the link among democracy, privacy and association in *NAACP v Alabama*, when it held the State of Alabama could not seek discovery of NAACP membership lists, explaining the "freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth

Amendment" (*id*. at 460). Because "compelled disclosure of membership in an organization engaged in advocacy of particular beliefs" can chill association, "[i]nviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs" (*id*. at 462). The Court emphasized that point again just five years later when Florida similarly attempted to gain access to NAACP membership lists, holding not only was the right to associate guaranteed by the Fourteenth Amendment, but so was the "protection of privacy of association in organizations" (*Gibson v Florida Legislative Investigation Committee*, 372 US 539, 544 [1963]). The home offers little privacy protection to groups, no less the homeowner, if the police may enter at any point in a gathering in the hopes of obtaining evidence with which to prosecute someone present.

To avoid such invasions, the Supreme Court has relied on the ability of criminal defendants to exclude evidence seized in violation of the Fourth Amendment. The Court imposed the exclusionary rule after alternative attempts to curb illegal police conduct failed (*Mapp,* 367 US at 642 ["(t)he experience of California that such other remedies have been worthless and futile is buttressed by the experience of other states"]). The exclusionary rule has been chipped away at over the decades through a variety of exceptions—notably, a chorus of scholars concluded that the largest impediment to its utility has been the "standing" doctrine.[5] Although *Rakas* properly ended the "standing" doctrine and relocated

---

[5] *See e.g.* David Gray, *Collective Standing under the Fourth Amendment*, 55 Am Crim L Rev 77, 89 (2018) ("The rules governing Fourth Amendment standing under *Katz* have

our analysis to the substance of privacy expectations, there remains a connection between the substance of Fourth Amendment privacy rules and police behavior. Thus, as with many Fourth Amendment questions, it is important to consider how the rule regarding social guest privacy relates to the "balance" at work in our law between effective law enforcement and individual privacy interests. The harder it is for invitees to a home to challenge warrantless police intrusions, the less the police will be deterred from warrantless entries where the target of their investigation steps into another's—even a family member's or a partner's—home.

The Supreme Court confirmed the dangers of excessive police discretion in *Steagald*, when it held police must obtain a search warrant before entering the home of one person to arrest another (451 US at 222). That case bears some resemblance to the one at hand: looking for a fugitive and with only a warrant for the person's arrest, the police entered a home, frisked several people, and searched the premises, finding evidence of narcotics (*id.* at 206-207). Only after the initial entry and search did the officers send for a search warrant (*id.* at 207). One of the residents of the home challenged the search as unconstitutional and the Supreme Court agreed, explaining that "[a] contrary conclusion –

---

dramatically diminished the security of the people against threats of unreasonable search and seizure."); Paul R. Joseph & Michael Hunter, *Circumventing the Exclusionary Rule through the Issue of Standing*, 10 J Contemp L 57, 63 (1984) ("The fourth amendment standing doctrine is the final and perhaps broadest means of circumventing the exclusionary rule"); Darlene Stosik, *The Death Knell of Automatic Standing – Another Blow to Fourth Amendment Privacy*, 35 U. Miami L Rev 361, 369 (1981) ("the Court's discontent with the exclusionary rule has firmed its determination to restrict access to the benefits of that rule by continuing to limit the invasions forbidden by the fourth amendment").

that the police acting alone and in the absence of exigent circumstances, may decide when there is sufficient justification for searching the home of a third party for the subject of an arrest warrant – would create significant potential for abuse" (*id.* at 215). That concern with police discretion permeates the decision—the Court wrote: "armed solely with an arrest warrant for a single person, the police could search all of the homes of that individual's friends and acquaintances" (*id.*). This level of "unfettered discretion," is incompatible with the Framer's goals in drafting the Fourth Amendment (*id.* at 220). The Supreme Court's solution was simple: get a warrant.

Here, if we were to fail to recognize the privacy interests of social guests, police would possess similarly unfettered discretion to invade the homes of the friends and family members of police suspects who invite the person inside. Effective law enforcement does not require this type of entry. The officers, in circumstances like this, have options. If Detective Fernandez was only 15-20 feet behind Spanky, chasing him into an apartment because of concerns that he was a danger to himself or others (for example, if he were armed), or if the officers had a fear that evidence was being destroyed, then the doctrine of hot pursuit would allow officers to enter the apartment without a warrant. But the People have never attempted to justify this particular warrantless entry in that manner, which suggests the People may have thought the pursuit, and concomitantly the legal basis, was not so hot. The officers could have knocked and asked for permission to enter, but they did

not.[6] Or they could have surrounded the apartment (as they apparently did when securing it after removing the occupants), obtained a search warrant, or—even without a warrant— arrested and searched the person they identified as Spanky if he exited the apartment.

A clear articulation of the scope of social guest privacy is overdue. The controlling case in New York is *Ortiz*, which we decided after *Olson* but before *Carter* and, as previously discussed, affirmed on a limited procedural posture. Nonetheless, *Ortiz's* holding that the defendant was merely a "casual visitor" appears to have become the standard in our lower courts. Since *Ortiz*, numerous Appellate Division opinions contain terse, conclusory findings that defendants who argued their privacy rights were violated in searches of premises aside from their own homes were "casual visitors" without legitimate privacy expectations (*see e.g. People v Harvey*, 170 AD3d 1675, 1677 [4th Dept 2019] [finding a defendant, "in as much as he did not live in…and was at most a casual visitor" in the house police searched lacked a legitimate expectation of privacy]; *People v Gray*, 151 AD3d 1470, 1471 [3rd Dept 2017] [finding that the defendant was a "casual visitor" in the apartment where his cousin and the cousin's mother resided]; *People v Santiago*, 765 NYS2d 853, 2003 NY Slip. Op. 13011 [1st Dept 2003] [finding a son's connection to his mother's apartment "tenuous" at best].

V

---

[6] It is not uncommon for the police, lacking a warrant, to ask permission to enter a home and for an occupant to grant it (*see e.g. People v Carter*, 30 NY2d 279, 282 [1972] [affirming the constitutionality of a search of an apartment to which the defendant's wife consented]).

"If it were not for guests all houses would be graves" (Khalil Gibran, Sand and Foam 33 [1926]). Ultimately, I do not believe our "society is prepared to recognize as 'reasonable'" the warrantless entry into a private home to obtain evidence against a guest who has been invited by the home's residents for something as consequential as a meal or a meeting (*Katz*, 389 US at 361). Even those who would be happy to have the police enter their homes at will to seek evidence against their friends, however, should recognize the unreasonableness of denying those friends an evidentiary hearing to determine what degree of privacy they reasonably expected and whether the police conduct unlawfully intruded on that expectation. All I would do here is that bare minimum: remit this case for the hearing Mr. Ibarguen requested. The United States Supreme Court will eventually define the scope of the privacy rights of various sorts of invitees; in the interim, defendants who establish that their claim falls within the fog should be entitled to make the best case they can at an evidentiary hearing. Only in that way will the fog clear.

Order affirmed, in a memorandum. Chief Judge DiFiore and Judges Fahey, Garcia, Singas and Cannataro concur. Judge Wilson dissents in an opinion, in which Judge Rivera concurs.

Decided October 14, 2021